IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 3:16-CR-516-D |
| | § | |
| WADE NEAL BARKER (3), | § | |
| WILTON MCPHERSON BURT (4), | § | |
| JACKSON JACOB (8), | § | |
| DOUGLAS SUNG WON (9), | § | |
| MICHAEL BASSEM RIMLAWI (10), | § | |
| DAVID DAESUNG KIM (11), | § | |
| WILLIAM DANIEL | § | |
| NICHOLSON, IV (12), | § | |
| SHAWN MARK HENRY (13), | § | |
| MRUGESHKUMAR KUMAR | § | |
| SHAH (14), | § | |
| ANDREW JONATHAN | § | |
| HILLMAN (19), and | § | |
| SEMYON NAROSOV (20), | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Several defendants who are charged in a multi-count indictment alleging various crimes related to an alleged health care bribe and kickback scheme move under Fed. R. Crim. P. 12(b)(1) to dismiss certain counts of the indictment. Concluding that the indictment sufficiently states the offenses charged and that no other reasons warrant dismissal, the court denies the motions.[1]

---

[1]This memorandum opinion and order decides all motions addressed to the indictment and a September 14, 2017 motion to dismiss the Travel Act counts in the superseding

I

Defendants are physicians or other individuals who were associated with the now-closed Forest Park Medical Center Dallas ("FPMC"), a physician-owned surgical hospital. The indictment charges defendants with various health care and financial crimes. In nine motions, several defendants move to dismiss Count 1[2] of the indictment, which charges a conspiracy to pay and receive health care bribes and kickbacks, in violation of 18 U.S.C. § 371, and/or to dismiss Counts 12, 13, 15, and 17, which allege violations of the Travel Act, 18 U.S.C. § 1952, and are predicated on violations of Texas law.[3] The government opposes

_____

indictment, filed by the Surgeon Defendants (*see infra* note 6 for a definition of the term "Surgeon Defendants"). On August 30, 2017 the grand jury handed up a superseding indictment. The superseding indictment adds Travel Act counts (new Counts 19, 20, and 21) and makes other changes that, *inter alia*, affect paragraph numbers that this memorandum opinion and order cites from the indictment. The court has determined that it should not deny the pending motions as moot or require additional briefing given the substantial similarities between the indictment and the superseding indictment, and the delay and expense associated with requiring new motions and briefing. If, in addition to the Surgeon Defendants, other defendants move to dismiss the superseding indictment on the grounds set out in the present motions, the court will apply today's memorandum opinion and order to those motions to the extent it applies.

[2]The indictment refers to this count as "Count One." For consistency—the other counts are designated by numerals—the court will refer to this count as "Count 1."

[3]The following motions are addressed in this memorandum opinion and order: Andrew Jonathan Hillman and Semyon Narosov's April 21, 2017 motion to dismiss indictment; Michael Bassem Rimlawi's May 25, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Douglas Sung Won's May 26, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Mrugeshkumar Kumar Shah's May 31, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Surgeon Defendants' (Drs. Henry, Won, Rimlawi, Kim, and Nicholson's) June 5, 2017 motion to dismiss the Travel Act counts; Wade Neal Barker's June 7, 2017 motion to dismiss the Travel Act counts; Shawn Mark Henry's June 13, 2017 motion to dismiss count one of the indictment; Jackson Jacob's June

- 2 -

the motions.[4]

## II

Defendants Andrew Jonathan Hillman ("Hillman"), Semyon Narosov (Narosov"), Michael Bassem Rimlawi ("Rimlawi"), Douglas Sung Won ("Won"), Mrugeshkumar Kumar Shah ("Shah"), Shawn Mark Henry ("Henry"), and Jackson Jacob ("Jacob") move to dismiss Count 1 of the indictment, which alleges a conspiracy to pay and receive health care bribes and kickbacks, in violation of 18 U.S.C. § 371.

## A

Some or all defendants maintain that the indictment relies on conduct that is barred by the five-year statute of limitations that applies to violations of 18 U.S.C. § 371, or neglects to disclose that certain defendants did not engage in alleged criminal conduct or participate in the alleged conspiracy within the limitations period; that to the extent defendants were involved in a conspiracy, it was a separate conspiracy that was completed before the limitations period began; that although the government may generally rely on a presumption of continuity to show that participation continued into the limitations period in the absence

_____

30, 2017 motion to dismiss indictment count one and the Travel Act Counts (13 through 18) and to join codefendants motions to dismiss; Wilton McPherson Burt's July 7, 2017 motion to dismiss the Travel Act counts (12, 13, 15, and 17) in the indictment and to join in codefendants' motion to dismiss; and Surgeon Defendants' September 14, 2017 motion to dismiss the Travel Act counts in the superseding indictment.

[4]Some defendants have requested oral argument. These requests are denied based on the court's determination that oral argument would not aid the court's decisional process. *See* N.D. Tex. Crim. R. 47.1(g) ("Unless otherwise directed by the presiding judge, oral argument on a motion will not be held.").

of overt acts by a defendant, the government is barred from doing so here because its own evidence conclusively establishes that defendants terminated their participation in the alleged conspiracy before the limitations period; that the indictment purports to charge one general conspiracy but actually charges several, separate conspiracies (e.g., three separate conspiracies, or twelve separate conspiracies); and that the indictment fails to adequately allege that the defendant in question was involved in a conspiracy or in any unlawful conduct. The court will consider defendants' motions together.[5]

## B

To be sufficient, an indictment must "'allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.'" *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013) (quoting *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999)). "Thus, an indictment is sufficient if it 'contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend.'" *Id.* (quoting *United States v. Fuller*, 974 F.2d 1474, 1480 (5th Cir. 1992)). "It is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978) (citations omitted). "Generally, an indictment which follows the language of the statute under which it is brought is sufficient to give a defendant notice of the crime of which he is charged."

---

[5]In some respects, defendants' motions read more like post-verdict challenges to the sufficiency of the evidence than to pretrial challenges to the sufficiency of the indictment.

*United States v. Thomas*, 348 F.3d 78, 82 (5th Cir. 2003) (internal quotation marks and citations omitted); *see also United States v. Massey*, 849 F.3d 262, 264 (5th Cir. 2017); *United States v. Hagmann*, 950 F.2d 175, 182-83 (5th Cir. 1991). When the court decides a motion to dismiss the indictment for failure to state an offense, it is required to "'take the allegations of the indictment as true and to determine whether an offense has been stated.'" *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998)).

## C

18 U.S.C. § 371—one of several federal conspiracy statutes—provides, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Count 1, which explicitly incorporates the preceding 41 paragraphs of the indictment, includes 104 paragraphs of its own (¶¶ 42-145), 47 paragraphs (¶¶ 99-145) of which allege overt acts. Paragraph 43 specifically identifies the offenses against the United States that defendants allegedly conspired to commit:

> From in or around early 2008, through in or about January 2013, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, [defendants] and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit certain offenses against the

United States, that is: a. to violate 42 U.S.C. § 1320a-7b(b)(2)
. . . ; b. to violate 42 U.S.C. § 1320a-7b(b)(1) . . . ; c. to violate
42 U.S.C. § 1320a-7b(b)(1) . . .; and d. to violate 18 U.S.C. §
1952[.]

Indictment ¶ 43.

The court concludes that Count 1 of the indictment is sufficient "because it contains the elements of the offense charged and fairly informs the defendants of the charge against which they must defend." *United States v. Petras*, 2016 WL 1054597, at *2 (N.D. Tex. Mar. 17, 2016) (Fitzwater, J.) (citing *United States v. Persing*, 318 Fed. Appx. 152, 154 (4th Cir. 2008) (per curiam) ("Because the indictment filed against [the defendant] alleged the essential elements of the offense, and tracked the statutory language, we find that the indictment was valid.")), *appeals docketed*, Nos. 16-11631 and 16-11648 (5th Cir. Nov. 16, 2016).

## D

As noted, defendants also contend that Count 1 is barred by the statute of limitations, as applied to them. The force of this argument depends, however, on the conclusion that Count 1 of the indictment charges multiple, independent conspiracies. The court agrees with the government that the allegations of Count 1, taken as true, charge a single, overarching conspiracy from in or around early 2008 through in or about January 2013. *See, e.g., United States v. Lokey*, 945 F.2d 825, 831 (5th Cir. 1991) (addressing constructive amendment challenge based on assertion that defendants were convicted of multiple conspiracies, not single conspiracy charged in indictment, and stating that "[w]hether the evidence proved one

or more conspiracies turns on (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap among the participants in the various dealings."). Because the court concludes that Count 1 sufficiently charges a single, overarching conspiracy, it holds that Count 1 cannot be dismissed on the basis that it charges an offense that is time-barred. This is so because the indictment charges that the last overt act occurred on September 28, 2012, within the limitations period. *See* Indictment ¶ 125.

Accordingly, the court denies Hillman and Narosov's April 21, 2017 motion to dismiss indictment; Rimlawi's May 25, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Won's May 26, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Shah's May 31, 2017 motion to dismiss count one of the indictment and to join codefendants' motions to dismiss; Henry's June 13, 2017 motion to dismiss count 1 of the indictment; and the part of Jacob's June 30, 2017 motion to dismiss indictment count one and the Travel Act Counts (13 through 18) and to join codefendants motions to dismiss that addresses count one.

### III

Defendants Henry, Kim, Nicholson, Rimlawi, Won,[6] Barker, Jackson, and Wilton McPherson Burt ("Burt") move to dismiss the Travel Act counts—Counts 12, 13, 15, and

---

[6]Drs. Henry, Kim, Nicholson, Rimlawi, and Won filed a joint motion in which they refer to themselves collectively as the "Surgeon Defendants."

17.[7]  In four motions to dismiss, some or all defendants maintain that the indictment fails to state Travel Act offenses against the Surgeon Defendants[8] because it relies on the conduct of other defendants to satisfy the Act's most basic elements; the indictment cannot rely on the Texas Commercial Bribery Statute ("TCBS"), Tex. Penal Code Ann. § 32.43 (West 2017), as the predicate state-law violation because the TCBS is preempted by the federal Anti-Kickback Statute since the TCBS criminalizes conduct that the Anti-Kickback Statute specifically identifies as lawful and shields from prosecution under numerous "safe harbors"; the TCBS conflicts with a later-enacted and more specific Texas law—the Texas Solicitation of Patients Act ("TSPA"), Tex. Occ. Code Ann. § 102.001 (West 2012)—which incorporates federal safe harbors and governs the arrangements at issue in this case; the TCBS is unconstitutionally vague because it fails to provide adequate notice of the conduct it prohibits and encourages arbitrary and discriminatory enforcement; allowing the federal government to prosecute a health care provider under TCBS via the Travel Act would violate principles of federalism and Supreme Court precedent, given that the State of Texas has never prosecuted health care providers under the TCBS; the TCBS applies only to certain acts undertaken by a "fiduciary" in relation to the affairs of his "beneficiary," and it is clear from the face of the statute that Burt is neither a "fiduciary" under the statute nor did he have a

---

[7]In Jackson's motion, he challenges Counts 13 through 18.  The court's decision applies to all such counts.

[8]*See supra* note 6 for the defendants who are included in the group of "Surgeon Defendants."

fiduciary-beneficiary relationship with any of FPMC's patients; and the Travel Act count against Kim (Count 13) should be dismissed because it is barred by the statute of limitations.. In the Surgeon Defendants' motion to dismiss the Travel Act counts in the superseding indictment, in addition to reasserting the arguments of their previous motions, they maintain that the new Counts 19, 20, and 21 must be dismissed for failing to properly allege a use of a facility in interstate commerce, as required under the Travel Act.

IV

The court considers first the contention that the indictment fails to state Travel Act offenses against the Surgeon Defendants—either as principals or as aiders and abettors—because it relies on the conduct of other defendants to satisfy the Act's most basic elements. Defendants contend that the indictment should be dismissed because the Travel Act counts fail to allege facts that would show the use of a facility in interstate commerce, the requisite *mens rea*, and the subsequent performance of an unlawful act covered by the statute. As noted above, to be sufficient, an indictment must "allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *Lawrence*, 727 F.3d at 397 (citation omitted); *see supra* § II(B). The court concludes that the Travel Act counts are sufficiently alleged because they include the elements of the charged crime and therefore allow defendants to prepare their defenses.

A

The Travel Act prohibits use of interstate facilities to promote or carry on certain unlawful activities. *See* 18 U.S.C. § 1952(a). The Act provides:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform—
>
> (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both[.]

*Id.* When defining "unlawful activity," the statute lists "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* at § 1952(b). To sustain a conviction under the Travel Act, the government must prove (1) travel in interstate or foreign commerce, or use of the mail (or any facility) in interstate or foreign commerce; (2) with specific intent to promote, manage, establish, carry on—or distribute the proceeds of—unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel. *United States v. Logan*, 949 F.2d 1370, 1380-81 (5th Cir. 1991) (citing *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1350 (5th Cir. 1988)). Ultimately, because the Travel Act "'fully and unambiguously

- 10 -

sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient.'" *Hagmann*, 950 F.2d at 183 (quoting *United States v. Stanley*, 765 F.2d 1224, 1239 (5th Cir. 1985)).

18 U.S.C. § 2, which governs guilt as an aider and abettor, provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. It does not define a separate crime. *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980). Instead, it merely makes punishable as a principal one who aids or abets another in the commission of a substantive offense. *Id.* (citing *United State v. Cowart*, 595 F.2d 1023, 1031 n.10 (5th Cir. 1979)). To prove that a defendant is guilty as an aider and abettor, the government must prove that "the elements of the substantive offense occurred; and the defendant 'associate[d] himself with the venture, . . . participate[d] in it as something . . . he wishe[d] to bring about, . . . [and sought] by his actions to make it succeed.'" *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007) (brackets and ellipses in original) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). In this way, aiding and abetting liability requires "knowledge of all elements of the underlying crime." *Id.* at 315 (citing *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978)). At the indictment stage, "'the rule is well-established, both in this circuit and others, that one who has been indicted as a principal may be convicted on evidence showing that he merely

aided and abetted the commission of the offense.'"  *United States v. Davis*, 97 Fed. Appx.

486, 487 (5th Cir. 2004) (per curiam) (quoting *United States v. Bullock*, 451 F.2d 884, 888

(5th Cir. 1971)); *Walker*, 621 F.2d at 166.

Paragraph 149 of the Indictment (¶ 147 of the superseding indictment) asserts Travel

Act violations under an aiding and abetting theory of liability.  It charges, in relevant part:

> From on or about November 15, 2011 through in or about
> January 2013 . . . Toussaint, Barker, Beauchamp, Burt, Jacob,
> Henry, Kim, Foox, Won, Gonzales, and Nicholson, aiding and
> abetting one another and others known and unknown to the
> Grand Jury, used and caused to be used facilities in interstate
> commerce with the intent to promote, manage, establish, carry
> on, distribute the proceeds of, and facilitate the promotion,
> management, establishment, carrying on, and distribution of the
> proceeds of an unlawful activity, that is, Commercial Bribery in
> violation of [the TCBS], and thereafter, to perform and attempt
> to perform acts to promote, manage, establish, carry on,
> distribute the proceeds of, and facilitate the promotion,
> management, establishment, carrying on, and distribution of the
> proceeds of such unlawful activity[.]

Indictment ¶ 149.  Paragraph 149 also contains a table with more specific factual allegations.

The table is divided into six columns with the following titles: Count, Bribe or Kickback

Payors, Bribe or Kickback Recipient, Use of Facility in Interstate Commerce, Acts

Performed Thereafter, and Check #.  Each row alleges specific facts for Counts 12 through

18.

## B

The Surgeon Defendants maintain that the Travel Act counts (Counts 12, 13, 15, and

17 of the Indictment) should be dismissed.  Their multifaceted arguments can be divided into

two larger theories.

First, they contend that the indictment fails to allege any of the three essential elements of § 1952. The Surgeon Defendants assert that they did not perform any of the uses of a facility in interstate commerce alleged in the indictment. Similarly, they posit that none of the indictment's allegations of intent is "linked to a Surgeon Defendant traveling or using a facility of interstate commerce . . . with the intent to distribute the proceeds of an unlawful activity[.]" Ds. (Surgeon Defendants) Br. 10. The Surgeon Defendants also maintain that the indictment fails to demonstrate that they took any subsequent overt action to satisfy the third element of § 1952.

Second, the Surgeon Defendants contend on three grounds that the Travel Act counts are insufficient even under an aiding and abetting theory. They primarily assert that the Travel Act counts fail to specifically charge them with aiding and abetting violations of § 1952. Relatedly, they contend that the indictment does not demonstrate that they aided and abetted each material element of the alleged offense, instead relying on the acts of others. Finally, the Surgeon Defendants assert that an aiding and abetting theory fails because the indictment does not allege that any principal committed a Travel Act violation.

The government contests all grounds. It first responds that indictment provides the Surgeon Defendants with "unambiguous notice that they are charged under an aiding and abetting theory." Gov't Br. 10. Accordingly, the government argues that there is no requirement that a person who aids and abets a Travel Act violation have knowledge of the use of specifically interstate facilities, nor that the aider and abettor have specific intent

- 13 -

regarding the use of those facilities.  Instead, the government contends that the indictment sufficiently provides required notice to the Surgeon Defendants through the facts alleged in ¶ 149 and by further identifying the Surgeon Defendants' receipt of specific bribes, satisfying the Travel Act's subsequent overt act requirement.

## C

The court concludes that the indictment sufficiently states the elements of the offense to provide the Surgeon Defendants with the notice required to prepare their defense.  First, the indictment provides explicit notice of the government's intent to pursue an aiding and abetting theory of guilt.  Not only does the relevant section of the indictment specify 18 U.S.C. § 2, but the text of ¶ 149 specifically charges that defendants were "aiding and abetting" one another, in violation of the Travel Act.[9]  Paragraph 149 then proceeds to allege all of the essential elements of a § 1952 charge.  The indictment's plain language tracks the language of 18 U.S.C. § 1952, alleging that the Surgeon Defendants—aiding and abetting themselves and the other defendants charged—used and caused to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the

---

[9]The Surgeon Defendants contend that the table of specific Travel Act counts only states that defendants Beauchamp, Touissant, Barker, Burt, and Jacob were "aiding and abetting" each other, without mentioning the Surgeon Defendants.  But this isolated text does not detract from the notice provided in ¶ 149, which explicitly lists the Surgeon Defendants as aiders and abettors.  Moreover, this text is only found in the "Bribe or Kickback Payors" column, after Beauchamp, Touissant, Barker, Burt, and Jacob are listed as bribe or kickback payors.  Having been preceded by ¶ 149, the logical inference from this text is that Beauchamp, Touissant, Barker, Burt, and Jacob specifically worked together as bribe payors—not that they were the only aiders and abettors to the Travel Act violations as a whole.

proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, (commercial bribery, in violation of the TCBS), and, thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity. The accompanying table then provides more notice to the Surgeon Defendants by specifying how each allegedly aided and abetted violations of the Travel Act by receiving specific bribe payments. Thus the Surgeon Defendants are capable of both asserting defenses against these charges, and, if necessary, invoking double jeopardy in the future.

Moreover, the indictment's notice of an aiding and abetting theory is not lessened or negated by the any of the Surgeon Defendants' contentions. Accepting the allegations of the indictment as true, ¶ 149's overarching factual basis and Travel Act charge indicates that the Surgeon Defendants had the required "knowledge of all the elements of the underlying elements of the offense" in order to aid and abet its commission. *McDowell*, 498 F.3d at 316. To sustain a conviction at trial, the government will of course need to prove that the Surgeon Defendants "aided and abetted each material element of the alleged offense[s]." *United States v. Morrison*, 833 F.3d 491, 501 (5th Cir. 2016) (brackets in original) (quoting *United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir. 1998)). At the indictment stage, however, all that is required is notice that "enable[s] the accused to prepare his defense." *Lawrence*, 727 F.3d at 397. The Travel Act counts of the indictment satisfy this standard.

The Surgeon Defendants' final objection is that the indictment for aiding and abetting

is insufficient because it fails to name a principal who committed all elements of the offense. A defendant cannot be convicted of aiding and abetting if there was no crime committed to aid or abet. *See United States v. Barfield*, 447 F.2d 85, 89 (5th Cir. 1971). But the court can find no authority in this circuit or others for the premise that an indictment for aiding and abetting must name a specific principal, nor do the Surgeon Defendants cite to any such authority. On the contrary, the Fifth Circuit has held that "it is not necessary [for aiding and abetting criminal culpability] that the principal be convicted or *even that the identity of the principal be established*." *Hendrix v. United States*, 327 F.2d 971, 975 (5th Cir. 1964) (emphasis added); *see also United States v. Lopez-Monzon*, 2015 WL 13401899, at *5 (S.D. Tex July 8, 2015) (citing *Hendrix*). As the foregoing analysis demonstrates, taken as true, the allegations of ¶ 149, and its accompanying table, sufficiently demonstrate that Travel Act violations took place.[10] Therefore, the indictment adequately alleges each essential element of the offense charged and enables the Surgeon Defendants to prepare their defense, and to invoke the double jeopardy clause in any subsequent proceeding.

---

[10]The indictment can, in fact, be read as naming specific principals. In the table of specific counts, the column entitled "Acts Performed Thereafter" lists the third element of the Travel Act for each count. The indictment alleges these claims in the passive voice, which serves to highlight the alleged receipt of a bribe by each Surgeon Defendant. In order for one to receive a bribe, however, someone else must pay the bribe. The table specifies "Bribe or Kickback Payors" for each specific count. If, as the indictment charges, the bribe payors made the payments listed in the "Acts Performed Thereafter" column—and made separate uses of facilities in interstate commerce—they committed all three elements of the Travel Act, and therefore acted as principals, as charged in the indictment.

V

The Surgeon Defendants attack the validity of the TCBS itself on a number of grounds. The court considers together defendants' contentions that the TCBS cannot support a Travel Act charge because it is preempted by federal law, conflicts with another Texas statute, and is unconstitutionally vague.[11]

A

The TCBS makes it unlawful for a fiduciary "without the consent of [the] beneficiary, [to] [] intentionally or knowingly solicit[], accept[], or agree[] to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of [the] beneficiary." Tex. Penal Code Ann. § 32.43(b). Section 32.42(a) lists physicians among the various roles and professions that qualify as fiduciaries. *Id.* § 32.43(a)(2)(C).

B

The court first examines whether the TCBS is preempted under federal law. "Under the doctrine of federal preemption, a federal law supersedes or supplants an inconsistent state law or regulation." *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016). The Supreme Court has identified three types of preemption: express, field, and conflict. *Id.* Conflict preemption occurs either "(i) when compliance with both state and federal law is impossible"

_____

[11]The government contends that the court should not consider challenges to the state statute because state law only serves a definitional purpose under the Travel Act. The court need not consider this issue because it rejects each of defendants' challenges to the TCBS.

or "(ii) when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*[12] The Surgeon Defendants maintain that the obstacle component of conflict preemption applies here. What qualifies as a sufficient obstacle is a matter of judgment "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Indeed, "'the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)). The court approaches all preemption cases with the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Castro v. Collecto, Inc.*, 634 F.3d 779, 784 (5th Cir. 2011) (quoting *Wyeth*, 555 U.S. at 565) (internal quotation marks omitted).

1

Defendants contend that the TCBS is preempted by federal law. They maintain that it is an obstacle to the accomplishment and goals of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and regulations promulgated under it, 42 C.F.R. § 1001.952. The Surgeon Defendants first contend that the TCBS criminalizes activity that federal law protects under safe harbor provisions. The federal safe harbor provisions under the Anti-Kickback Statute—both statutory and regulatory—arose from a "concern . . . among a

---

[12]Defendants do not contend that the TCBS is preempted under express preemption or field preemption.

number of health care providers that many relatively innocuous, or even beneficial, commercial arrangements are technically covered by the [Anti-Kickback Statute] and are, therefore, subject to criminal prosecution." Proposed Rule: OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088-01, 3088 (Jan. 23, 1989). The TCBS, in contrast, has no safe harbor provisions. Second, the Surgeon Defendants note that while the federal Anti-Kickback statute requires a "knowing and willful" *mens rea*, the TCBS reaches only "knowing" conduct.

### 2

Because the Surgeon Defendants' conflict preemption contention depends on the "full purpose and objectives of Congress," the court begins with a brief overview of the Anti-Kickback Statute's text and history. Entitled "Criminal penalties for acts involving Federal health care programs," the current statute provides:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1).  The statute's subsequent section also prohibits "knowingly and willingly" offering or paying any remuneration for the same purposes.  *Id.* § 1320a-7b(b)(2).  The offense can be reduced to three elements: (1) knowingly and willfully (2) soliciting or receiving a remuneration (3) in return for inducing business related to a federal health care program.  *See United States v. Shoemaker*, 746 F.3d 614, 626-27 (5th Cir. 2014); *United States v. Turner*, 561 Fed. Appx. 312, 318 (5th Cir. 2014).  The statute includes several safe harbors that specify situations that are exempt from these kickback prohibitions.  42 U.S.C. § 1320a-7b(b)(3).  The U.S. Department of Health and Human Services ("HHS") has also promulgated over twenty regulatory safe harbors.  *See* 42 C.F.R. 1001.952.

The current statute originated as part of the Social Security Amendments of 1972.  *See* Social Security Amendments of 1972, Pub.L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972).  It has been periodically revised, with additional amendments specifying prohibited conduct and adding the "knowingly and willingly" *mens rea* element, for example.  *See, e.g.,* Omnibus Reconciliation Act of 1980, Pub.L. No. 96-499, § 917, 94 Stat. 2599, 2625 (1980).  The statute is one of "several important tools used to protect patients and the Federal health care programs from fraud[.]"  80 Fed. Reg. 66726, 66726 (Oct. 29, 2015); *see also* Office of Inspector Gen., *Fact Sheet: Federal Anti-Kickback Law and Regulatory Safe Harbors* (Nov. 1999) ("[T]he federal anti-kickback law's main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.").

Relevant to this case, Congress began expanding the safe harbors to the anti-kickback

provisions in 1977.  There, Congress was responding to a concern that "the existing language of these penalty statutes [was] unclear and need[ed] clarification."  *United States v. Porter*, 591 F.2d 1048, 1054 (5th Cir. 1979) (quoting H.R. Rep. No. 95-393(II), at 53 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3039, 3055)) (internal quotation marks omitted).  Congress again expanded the Anti-Kickback Statute's provisions in 1987.  *See* Medicare and Medicaid Patient and Program Protection Act of 1987, Pub.L No. 100-93, §§ 4, 14, 101 Stat. 680, 688-89, 697-98 (1987).  The Act directed the HHS Office of Inspector General ("HHS OIG") to establish "regulations specifying those payment practices that will not be subject to prosecution under [the federal Anti-Kickback Statute]."  56 Fed. Reg. 35952, 35952 (July 29, 1991); *see also* Pub.L No. 100-93, § 14 (1987).  Similarly, in 1996 Congress directed the HHS OIG to create additional safe harbors in accordance with specified criteria in order to further "the interest of preventing fraud and abuse in Federal health care programs," while at the same time sparing "relatively innocuous commercial arrangements" from criminal prosecution.  79 Fed. Reg. 59717, 59718 (Oct. 3, 2014); *see also* Health Insurance Portability and Accountability Act of 1996, Pub.L. 104-191 § 205 (1996).  To date, HHS OIG has specified 25 regulatory safe harbor provisions.  *See* 42 C.F.R. 1001.952; Jennifer Maul, et al., *Health Care Fraud*, 54 Am. Crim. L. Rev. 1443, 1457-77 (2017).

During the notice and comment period for several of these safe harbor proposals, commenters "requested that OIG clarify the relationship between the statute and various State laws."  56 Fed. Reg. 35952 (July 29, 1991); *see also* 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006).  Responding to these concerns in the 1987 expansion, the HHS OIG stated:

> Issues of state law are completely independent of the federal anti-kickback statute and these regulations. There is no federal preemption provision under the statute. Thus, conduct that is lawful under the federal anti-kickback statute or this regulation may still be illegal under State law. Conversely, conduct that is lawful under State law may still be illegal under the federal anti-kickback statute.

56 Fed. Reg. 35952 (July 29, 1991). Responding to a similar question in 2006, the HHS OIG again advised commenters that the Anti-Kickback Statute's new safe harbors did "not create an exception to or preempt any other Federal law or any State law" unless incorporated by reference. 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006). In addition, Executive Order 13132 has required all federal agencies since 1999 to satisfy additional prerequisites before promulgating rules that have federalism implications or that preempt state or local law. Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 10, 1999). In compliance with this Executive Order, all subsequent HHS OIG promulgations of anti-kickback safe harbor provisions explicitly state that the regulations "do not . . . preempt State or local law[.]" 71 Fed. Reg. 45110, 45135 (Aug. 8, 2006); 72 Fed. Reg. 56632, 56643 (Oct. 4, 2007); 81 Fed. Reg. 88368, 88399 (Dec. 7, 2016). Congress itself has offered no additional guidance on the preemptive character of the Anti-Kickback Statute.

### 3

In support of their assertion that the TCBS is an obstacle to the purpose of the federal Anti-Kickback statute, the Surgeon Defendants rely heavily on *State v. Harden*, 938 So.2d 480 (Fla. 2006), the only reported case holding that the federal Anti-Kickback Statute preempts state law. In *Harden* the Supreme Court of Florida held that federal law preempted

Florida's anti-kickback statute, which had no safe harbors and required only a "knowing" *mens rea*.[13]  The court looked to the legislative history and found that the state law "criminalize[d] conduct that federal law specifically intended to be lawful and shielded from prosecution."  *Id.* at 492-93.  Comparing *Harden* to this case, however, demonstrates how obstacle preemption is an ill-fitting argument for the Surgeon Defendants.

The Florida statute and the federal Anti-Kickback Statute addressed the same conduct performed by the same individuals.  Both provisions applied only to kickbacks related to a federal health care program, such as Medicaid.  *Compare* Fla. Stat. Ann. § 409.920(2)(e) (2000) (prohibiting solicitation, offer, payment, or receipt of any remuneration in return for referring an individual "under Medicaid"), *with* 18 U.S.C. § 1320a-7b(b)(1) (prohibiting remuneration in return for referrals for which payment may be made under a "Federal health care program").  Moreover, both the Florida statute and federal law applied to any person who accepted kickbacks in relation to these federal funds, not just fiduciaries.  *See* 18 U.S.C. § 1320a-7b(b)(1); Fla. Stat. Ann. § 409.920(2)(e) (2000).  While the targets of both the federal and state statutes were aligned, the manner in which each pursued the targets differed.  In this way, the Florida statute's lack of safe harbor provisions and lower *mens rea* requirement created a stronger case for obstacle preemption.  It took the same actors' conduct

---

[13]The court in *Harden* noted that case law on this issue is very thin, possibly because many states' anti-kickback statutes were drafted to align with the federal law.  *Harden*, 938 So.2d at 492 n.9.

that federal law had exempted and exposed it to state criminal liability.[14]

Unlike the Florida statute, both the conduct and persons regulated by the TCBS are different from those the federal Anti-Kickback statute targets. The TCBS is broader than the Anti-Kickback Statute in some respects and narrower in others. The TCBS applies across industries, whereas federal law applies only to federal health care programs. *See* Tex. Penal Code Ann. § 32.43(b). But the TCBS is also narrower than federal law because it applies only to fiduciaries; the Anti-Kickback Statute has no such limitations. *Compare id. with* 18 U.S.C. § 1320a-7b(b)(1). Therefore, the TCBS's lack of safe harbor provisions is of less consequence than in the Florida case. Congress and the Texas state legislature are using these statutes to address different types of conduct performed by different potential actors. Taken together with consistent regulatory guidance that "[i]ssues of state law are completely independent of the federal [A]nti-[K]ickback [S]tatute and [its] regulations," 56 Fed. Reg. 35952 (July 29, 1991); *see also* 71 Fed. Reg. 45110, 45115 (Aug. 8, 2006) (advising the relevant anti-kickback safe harbor did not provide authority to preempt state law); 72 Fed. Reg. 56632, 56643 (Oct. 4, 2007) (same); 81 Fed. Reg. 88368, 88399 (Dec. 7, 2016) (same), and the absence of Congressional intent to the contrary, the TCBS's differing subject matter and reach suggest that it is not an obstacle to the federal Anti Kickback Statute's purpose and goals.

---

[14]While acknowledging the comparative strength of the preemption claim in *Harden*, the court here takes no position on the Supreme Court of Florida's ultimate holding in that case.

None of the other cases the Surgeon Defendants cite suggests otherwise. As in *Harden*, preemption in each of these cases resulted from a direct conflict or obstruction of the express goals of an agency or statute. *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), is particularly illustrative. In *Geier* the Court held that a state common-law tort action asserting that an auto manufacturer should have equipped a car with airbags—which federal standards did not require at the time—was preempted by federal law. Congress had specifically deferred to the Department of Transportation ("DOT") on the matter of airbag implementation, and the DOT had explicitly chosen not to require airbags in all cars in order to slowly phase them in over time. *Id.* at 875, 883. The other cited cases offer similarly direct conflicts with federal goals. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, ___ U.S. ___, 137 S.Ct. 1421 (2017) (holding that state statute requiring power of attorney to have explicit statement of intent to arbitrate before representative could consent to arbitration directly undermined Congressional intent behind Federal Arbitration Act: that arbitration agreements be treated equally to other contractual provisions); *Witty v. Delta Airlines, Inc.*, 366 F.3d 380 (5th Cir. 2005) (holding that failure-to-warn suit's requested warning of risk of injury resulting from sitting long periods of time on an airline would directly obstruct federal policy that passengers stay in their seats).

In contrast, the court finds no direct obstruction of federal goals here. Nothing in the federal Anti-Kickback statute or its regulations indicates that Congress intended the federal Anti-Kickback Statute to be the *exclusive* means of prosecuting health care fraud—indeed, the long coexistence of the federal statute with parallel state statutes suggests the opposite.

Moreover, the alleged "conflict" here does not arise from criminalizing exact conduct federal law protects, as in *Harden*. Instead, it is based on criminalizing behavior the federal law does not address.

The directness of the TCBS's conflict aside, the Surgeon Defendants still contend that where the TCBS and the federal Ant-Kickback Statute do overlap, the TCBS is preempted because it "criminalizes numerous arrangements that are permitted—even encouraged—under federal law" through the safe harbor provisions. Ds. (Surgeon Defendants) Br. 14. But the TCBS does not place the federal safe harbors out of a Texas physician's reach. Even where such a physician is dealing with Medicare patient, and a safe harbor provision is applicable (a hypothetical that does not match this case), the physician, with the patient's consent, can accept a benefit that the TCBS otherwise prohibits. *See* Tex. Penal Code Ann. § 32.43(b) ("A person who is a fiduciary commits an offense if, *without the consent of his beneficiary* . . .") (emphasis added). In a field defined by its cooperative federalism, this extra step does not qualify as a preemptive obstacle to Congress's "full purpose and objectives" for the Anti-Kickback Statute or its safe harbors.

For the court to infer preemption in this case, the obstacle to a federal goal must be clear enough to overcome the strong presumption against displacing the state's traditional police powers. *See Castro*, 634 F.3d at 784-85. Based on the foregoing analysis, the court cannot reach that conclusion, and therefore holds that federal law does not preempt the

TCBS.[15]

## C

Defendants next challenge the TCBS as invalid under state law on that basis that it was superseded by the TSPA.  Under the TSPA, a person commits a misdemeanor if he "knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency."  Tex. Occ. Code Ann. § 102.001(a).  The TSPA incorporates all of the safe harbors under the federal Anti-Kickback Statute.  *Id.* § 102.003.  Defendants contend that this statute, and its incorporation of the federal safe harbor provisions, supplant the earlier-passed TCBS.

## 1

Where, as here, the proper resolution "turns on the interpretation of Texas law, 'we are bound to apply [Texas] law as interpreted by the state's highest court.'"  *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010) (brackets in original) (quoting *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271-72 (5th Cir. 2000)).

---

[15]As noted, the Surgeon Defendants also argue that preemption applies because the TCBS imposes a higher *mens rea* requirement than does federal law.  Because the court concludes that the two statutes regulate and criminalize different conduct, it is immaterial whether the requisite *mens rea* differs.

Not unlike their federal counterparts,[16] Texas courts aim to give full effect to the Legislature's intent and assume "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012); *see also In re Lee*, 411 S.W.3d 445, 451 (Tex. 2013); *Am. Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363, 368 (Tex. 2012). The court takes "the Legislature at its word, and the truest measure of what it intended is what it enacted," and looks at "the language of the specific section at issue, as well as the statute as a whole." *In re Office of Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013). "[U]nambiguous text equals determinative text," and "'[a]t this point, the judge's inquiry is at an end.'" *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 (Tex. 2006)). A court should not resort to rules of construction or extratextual information to construe a statute when its language is clear and unambiguous. *Id.*

Where the text is ambiguous, however, the Texas Legislature has codified several rules of construction. Under the Texas Construction Code Act, "if statutes enacted at the same or different session of the legislature are irreconcilable, the statute latest in date of

---

[16]Federal courts interpreting statutes also place a premium on the statute's plain language. *See, e.g., Teter v. Warder*, 1997 WL 86454, at *2 (N.D. Tex. Feb. 20, 1997) (Fitzwater, J.) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("It is perhaps the cardinal rule of statutory interpretation that when a statute is unambiguous, it should be interpreted in accord with its plain meaning.")); *see also Conserv Ltd. Liam. Corp. v. Sw. Bell. Tel. Co.*, 350 F.3d 482, 486 (5th Cir. 2003) ("We begin, as we always do in matters of statutory interpretation, with the plain language and structure of the statute."); *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 175 (5th Cir. 2011) ("Statutory interpretation begins with the statute's plain language.").

enactment prevails." Tex. Gov't Code Ann. § 311.025(a). When a specific provision and a general provision appear to conflict, "the provisions shall be construed, if possible, so that effect is given to both." *Id.* § 311.026(a). Thus "a court should first attempt to harmonize apparently conflicting statutes." *Green v. JPMorgan Chase Bank, N.A.*, 937 F.Supp.2d 849, 858 (N.D. Tex. 2013) (Godbey, J.); *see also Argonaught Ins. Co. v. Baker*, 87 S.W.3d 526, 531 (Tex. 2002). If this attempt at reconciliation fails, Texas law provides that "the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest interest is that the general provision prevail." Tex. Gov't Code Ann. § 311.026(b). A court may consider several factors in construing a statute, including the circumstances of the statute's enactment, the legislative history, object aimed to be attained, and the consequences of a particular construction. *Id.* § 311.023. This doctrine of *in pari materia* codified in § 311.026, however, only applies if the two statutes "deal with the same general subject, have the same general purpose, or relate to the same person or thing or class of person or things." *Jones v. State*, 396 S.W.3d 558, 561 (Tex. Crim. App. 2013); *see also Shear v. State*, 2014 WL 1882757, at *1 (Tex. Crim. App. May 8, 2014).

## 2

The Surgeon Defendants maintain that the TCBS and the TSPA are irreconcilable. Because the TSPA incorporates all of the federal Anti-Kickback Statute's statutory and regulatory safe harbors, they contend that the TSPA "conflicts with the [TCBS] by permitting conduct that would plainly violate [the TCBS]." Ds. (Surgeon Defendants) Br. 17. Applying

both § 311.025 and § 311.026, they contend that between the two conflicting statutes, the TSPA is the more specific and the TCBS is the more general. While the TCBS is the state's general bribery provision, the TSPA applies only to those who knowingly refer or solicit health care patients. They also note that the TSPA is the later enacted statute. Thus the Surgeon Defendants posit that, under Texas law, the TSPA and its incorporated federal safe harbors should control over the TCBS.

The court concludes that neither § 311.025 nor § 311.026 applies to this case because, under their plain text, the TCBS and the TSPA are not irreconcilable.[17] Like the TCBS and the federal Anti-Kickback Statute, the TCBS and the TSPA can be read together without undermining either's effect. Their language indicates that the two statutes require different elements of proof and apply to different potential actors, which negates any conflict. Under the TSPA, any "person" who knowingly pays or accepts remunerations for securing or soliciting heath care patients commits a misdemeanor. *See* Tex. Occ. Code Ann. § 102.001(a). This includes not only physicians, but any individual or legal entity. *See* Tex. Gov't Code Ann. § 311.005(2) (defining "person" to include any corporation or legal entity). The TCBS, in a health care setting, specifically applies to physicians or other fiduciaries. Tex. Penal Code Ann. § 32.43(a). Moreover, to incur culpability, the physician needs to accept a benefit "on agreement or understanding that the benefit will influence the conduct

---

[17]Although there is some confusion in the briefing as to how the doctrine of *in pari materia* affects the application of §§ 311.025-026, the court need not reach this issue. Once the statutes are deemed not to be irreconcilable under the plain text of the statute, the question is moot.

of the fiduciary" relating to a patient without receiving that patient's consent. *Id.* § 32.43(b). Thus in the health care context, the TCBS applies to both narrower conduct and a narrower group of actors.

That physicians could fall under both statutes does not raise an irreconcilable conflict —just as it did not with the TCBS and the federal Anti-Kickback Statute. Here, physicians as fiduciaries have an additional duty under the TCBS either to obtain the consent of their patients before receiving a benefit that affects the patients' care or to refrain from receiving the benefit. That physicians must accomplish this extra step does not make the TSPA's incorporated safe harbors unattainable for physicians—their role as fiduciaries would simply require them to comply with additional requirements. As a result, there is no irreconcilable conflict between the statutes.

The Surgeon Defendants rely primarily on *Lee*, 411 S.W.3d at 451, to argue, first, that the TCBS and TSPA conflict, and, second, that §§ 311.025-026 apply. In *Lee* the Supreme Court of Texas held that § 153.0071 of the Family Code controlled a court's ability to overturn a mediated settlement agreement—as opposed to other provisions of the Family Code. But the *Lee* court—although mentioning §§ 311.025-026 in its analysis—grounded its decision on the plain language of the Family Code. In addition to plainly stating a procedure for reviewing mediated settlement agreements, § 153.0071 "unambiguously states that a party is 'entitled to judgment' on [a mediated settlement agreement] that meets the statutory requirements 'notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.'" *Id.* at 453 (quoting Tex. Fam. Code Ann. § 153.0071). The *Lee* court held that

- 31 -

"[t]he use of the word 'notwithstanding' indicates that the Legislature intended section 153.0071 to be controlling." *Id.* at 454. Here, the Surgeon Defendants point to no such language in the TSPA, and analysis of the relevant text indicates that there is no conflict. Because the two statutes are not irreconcilable, the court holds that the TSPA does not control over the TCBS.

D

The Surgeon Defendants' final challenge to the TCBS is that it is unconstitutionally vague as applied.

1

The application of a criminal statute fails to comport with the Fifth Amendment's Due Process Clause if the statute "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *United States v. McRae*, 702 F.3d 806, 837 (5th Cir. 2012) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (citation omitted). Moreover, when considering an as-applied challenge, the court analyzes "whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder*, 561 U.S. at 18-19 (brackets in original) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)); *see*

- 32 -

*also McRae*, 702 F.3d at 837.

2

Defendants rely on several reasons to contend that the TCBS is unconstitutionally vague. First, they maintain that the statute is vague as applied here because it is being used to criminalize conduct that is explicitly legal under the TSPA. The court disagrees, for the reasons explained *supra* at § V(C).

Second, defendants argue that the statute—which prohibits accepting or soliciting a benefit "on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary," Tex. Penal Code Ann. § 32.43(b)—is unconstitutionally vague because it does not define "influence the conduct of the fiduciary." Defendants posit that this opens individuals to criminal prosecution for innocuous arrangements, especially in the health care industry. In their brief, defendants present the following hypothetical: "a pharmaceutical company provides a physician with free samples—technically a benefit—and the physician prescribes the drug to her patients after noticing its efficacy in those who received samples." Ds. (Surgeon Defendants) Br. 19. Would the physician in this hypothetical be subject to criminal culpability under the TCBS? Surgeon Defendants maintain that the answer is unknowable from the TCBS's text, and that the statute is therefore unconstitutionally vague. The court disagrees.

"'[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder*, 561 U.S. at 19 (quoting *Hoffman Estates*, 455 U.S. at 495) (reversing court of appeals' decision in an

as-applied vagueness challenge for considering a "statute's application to facts not before it").  Regardless of the Surgeon Defendants' hypothetical, the term "influence" is not vague in respect to their conduct.[18]  Taking the allegations of the indictment as true, the Surgeon Defendants accepted bribe payments from officers of FPMC in exchange for referring patients to FPMC.  But for these payments, the Surgeon Defendants would have referred the patients elsewhere.  To a person of ordinary intelligence, the officers of FPMC paid the Surgeon Defendants with the mutual understanding that doing so would influence the Surgeon Defendants' care of their patients.  Because this conduct aligns with the elements of a TCBS violation, the TCBS provided fair notice of what was prohibited.

Third, defendants contend that the TCBS is vague because it does not require proof that the beneficiary or patient was harmed.  Defendants cite no case law supporting the theory that harm is required to criminalize bribery.  Nor do the myriad federal bribery and corruption statutes mandate such a particularized showing of harm to a victim.  *See, e.g.,* 18

---

[18]Even if the Surgeon Defendants were making a facial challenge, a plain reading of the TCBS indicates that their hypothetical would not incur criminal culpability.  The statute requires an "agreement or understanding that the benefit will influence the conduct of the fiduciary."  Tex. Penal Code Ann. § 32.43(b).  In the Surgeon Defendants' hypothetical, there is no such agreement or understanding.  While the pharmaceutical company may have intended to influence the physician, the two parties did not come to an understanding that the physician would ultimately prescribe the medicine to any patient.  The physician did not intend to immediately prescribe the drugs to patients—instead, the physician decided to prescribe the drug only after observing the drug's efficacy.  The mutuality requirement undermines both the Surgeon Defendants' hypothetical and their contention that the lack of definition of "influence" is unconstitutionally vague.  It could not extend to conduct unless *both* parties involved had the intention to influence the fiduciary's behavior.  Moreover, a physician could always remain within the confines of the law by first obtaining the patient's consent.

U.S.C. § 201(b) (criminalizing corrupt promise or transfer of anything of value to influence

official act of federal official); 18 U.S.C. § 201(c) (criminalizing transfer of anything of value

to federal official for or because of official act); 18 U.S.C. § 203 (prohibiting members of

Congress from receiving compensation for representational services); 18 U.S.C. § 208

(prohibiting executive branch officials from participating in government decisions in which

they have a financial interest). These public corruption statutes often embody the concept

that any action induced by a bribe harms the public because the bribe recipient has "set aside

the public trust for private advantage." Daniel Hays Lowenstein, *Political Bribery and the*

*Intermediate Theory of Politics*, 32 UCLA L. Rev. 784, 806 (1985). If the term "public" is

replaced by "beneficiaries," the same logic applies to a fiduciary. Similarly, legislatures

sometimes enact bright-line prophylactic prohibitions of an activity because of that activity's

common tendency to lead to more specific harms. *See, e.g., United States v. Miss. Valley*

*Generating Co.*, 364 U.S. 520, 550 (1961) (allowing "prophylactic" penal statute to stand

because it was the evident intent of Congress). Rather than muddle notice, such prophylactic

rules arguably give potential defendants *more* notice by clearly delineating their rights and

duties, as opposed to a statute conditioning punishment on a subsequent harm that may or

may not occur. The TCBS is one such statute. Therefore, the court rejects this argument.

Fourth, defendants contend that the TCBS encourages arbitrary enforcement because

of its vagueness. Defendants posit that the statute "defers to a prosecutor where to draw the

line between, on the one hand, a minor influence on a physician who would have referred her

patients to a particular hospital anyway, and on the other hand, a significant influence[.]" Ds.

(Surgeon Defendants) Br. 20-21.  The Surgeon Defendants cite *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001), for the proposition that the TCBS impermissibly "subjects a person to sanctions based on the subjective viewpoints of others, not their own behavior."  Ds. (Surgeon Defendants) Reply Br. 16.  They appear to contend that *Bell* prohibits a prosecutor's subjective (and potentially inconsistent) application of prosecutorial discretion in cases like theirs, and that the statute is therefore unconstitutionally vague.  But *Bell* is wholly unrelated to prosecutorial discretion.  Instead, the Fifth Circuit in *Bell* addressed a Texas statute that penalized behavior when a patient did not receive quality care, defined as "[t]he degree to which care meets or exceeds the expectations set by the patient."  *Bell*, 248 F.3d at 422.  *Bell* is irrelevant here.  And defendants have not cited any other case that would suggest that exercise of prosecutorial discretion is inappropriate based on the prosecutor's view of the severity of the offense.

The Surgeon Defendants do not present any other new reason why the TCBS encourages arbitrary enforcement; instead, their argument incorporates defendants' other vagueness arguments that the court has rejected.  Accordingly, the court denies the Surgeon Defendants' motion to dismiss on vagueness grounds.

VI

Defendants advance an additional argument for why the government's Travel Act counts should not rely on the TCBS: federalism.  According to defendants, Texas has never prosecuted a health care provider under the TCBS, and "[a]llowing the Government to transform a state law ignored by state prosecutors into a federal crime would impermissibly

alter sensitive federal-state relationships[.]" Ds. (Surgeon Defendants) Br. 21 (internal quotation marks and citations omitted). But this federalism concern is misplaced and has been rejected by the Supreme Court. "Because [Travel Act] offenses are defined by reference to existing state as well as federal law, it is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Similarly, "[b]ecause the Travel Act was within Congress' constitutional prerogative to enact, commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern." *United States v. Welch*, 327 F.3d 1081, 1093 (10th Cir. 2003). This reasoning has led multiple federal appellate courts to reject federalism challenges to the Travel Act. *See, e.g., id.*; *United States v. Nader*, 542 F.3d 713, 721-22 (9th Cir. 2008) (holding that interpreting the Travel Act broadly to encompass intrastate telephone calls does not offend principles of federalism); *United States v. Halloran*, 664 Fed. Appx. 23, 26 (2d Cir. 2016) (rejecting federalism challenge "without evidence that prosecutors affirmatively declined to prosecute similar schemes in the past"), *cert. denied sub nom. Tabone v. United States*, ___ U.S. ___, 137 S. Ct. 1361 (2017)

Nor does the Surgeon Defendants' reliance on *United States v. Ferber*, 966 F. Supp. 90 (D. Mass. 1997), undermine this reasoning. The *Ferber* court dismissed Travel Act charges that were predicated on Massachusetts's state gratuity statute. *Id.* at 106. Because the predicate offense for a Travel Act violation must be "extortion, bribery, or arson in violation of the laws of the States in which it is committed," 18 U.S.C. § 1952(b), federal

prosecutors argued that such a gratuities violation constituted "bribery" under Massachusetts law. The court disagreed, determining that the defendant's specific conduct did not constitute "bribery" under Massachusetts criminal law, and therefore could not be a predicate offense under the Travel Act without "upset[ting] the delicate balance between the powers of the federal and state sovereigns." *Ferber*, 966 F. Supp. at 103. In the present case, however, the Surgeon Defendants do not contest that the TCBS is not bribery under Texas law. And even the *Ferber* court stated that "[t]here is no doubt that a violation of the Massachusetts bribery statute is a valid predicate offense under the Travel Act." *Id.* at 103. Therefore, because commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern, the court concludes that the Travel Act counts do not run afoul of federalism principles.

## VII

Burt contends that the Travel Act counts against him—Counts 12, 13, 15, and 17—cannot apply because the government has not alleged that he (1) had any identifiable beneficiary and (2) that his conduct towards an alleged beneficiary was influence by a sought benefit. Burt maintains that this means the government cannot show that he violated the TCBS, and therefore cannot establish a Travel Act violation. The court disagrees.

The indictment specifically charges that Burt, and the other defendants, aided and abetted each other's Travel Act offenses. It is irrelevant that Burt himself might not be liable under the TCBS; if he aided and abetted another who can be guilty, he may be punished as if he committed the crime. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the

United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.") Because the court concludes *supra* at § IV(C) that the indictment sufficiently charges a Travel Act violation, it denies Burt's motion to dismiss on this ground.

## VIII

Kim also contends that the Travel Act count he is charged with—Count 13—is barred by the five-year statute of limitations. The statute of limitations begins to run when "all elements of the crime are first satisfied." *United States v. Ongaga*, 820 F.3d 152, 159 (5th Cir. 2016).

According to Kim, Count 13 is based only on an email allegedly sent on November 14, 2011. The statute of limitations would have run on November 14, 2016—two days before the indictment was returned. The government responds that the final element of the Travel Act charge, a subsequent act, was not satisfied until December 5, 2011. The indictment charges that an "act[] performed thereafter" occurred "[o]n or about December 5, 2011, [when] a check for $125,000 cleared a bank account controlled by Kim. The payment was made to Kim in exchange for his referring patients to FPMC as opposed to other facilities." Indictment ¶ 149. This allegation sufficiently alleges that the elements of the crime were not complete until December 5, 2011, and therefore the statute of limitations had not run when the indictment was filed. *See supra* § II(B).

- 39 -

IX

In the Surgeon Defendants' motion to dismiss the Travel Act counts in the superseding indictment, they raise a new argument: that the new counts do not allege a use of a facility in interstate commerce, as required by § 1952.[19] They assert that the clearing of a check over interstate wires to an Atlanta server—when the transaction is otherwise between two Texas banks—does not qualify as a "use of a facility in interstate commerce" because the interstate nature is too incidental to the alleged criminal activity.

There is "no requirement that the use of interstate facilities be essential to the scheme: it is enough that the interstate travel or use of interstate facilities makes easier or facilitates the unlawful activity." *United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978), *aff'd*, 444 U.S. 37 (1979); *see also United States v. Jones*, 642 F.2d 909, 913 (5th Cir. 1981) ("As long as the interstate travel or use of the interstate facilities and the subsequent facilitating act make the unlawful activity easier, the jurisdictional requisites under § 1952 are complete."); *United States v. Pecora*, 693 F.2d 421, 424-25 (5th Cir. 1982) (citing *Perrin* and *Jones*). Moreover, Fifth Circuit cases establish that because the terms "facilities of interstate commerce" and "facilities in interstate commerce" are synonymous, federal statutes using the latter phrase reach purely intrastate uses of interstate commerce facilities. *See United*

---

[19]The new motion to dismiss also alleges that Counts 19, 20, and 21 fail because they do not allege that a Surgeon Defendant actually used any facilities in interstate commerce, instead relying on the conduct of "non-Surgeon Defendants." Ds. (Surgeon Defendants) Mot. to Dis. Superseding Indictment Br. 4-5. As explained above, this is not required under an aiding and abetting theory. *See supra* § IV(C)

*States v. Marek*, 238 F.3d 310, 317-18 (5th Cir. 2001) (en banc).  Thus the purely intrastate use of the mail is sufficient to invoke federal jurisdiction under the Travel Act because it is a specified example of a facility in interstate commerce under the statute.  *See United States v. Heacock*, 31 F.3d 249, 254-55 (5th Cir. 1994).

The Surgeon Defendants rely on *United States v. Blake*, 684 F. Supp. 441, 444-45 (S.D. Miss. 1988), which held that the "clearing of local checks given by a local resident to local residents which happened to have crossed state lines in the clearing process is too tenuous a connection with interstate commerce to support Travel Act jurisdiction."  In *Blake*, however, the court only minimally engaged in *Perrin*'s rule, instead differentiating the *Blake* case from *Perrin* factually and relying on out-of-circuit authority for its holding.  *See id.* at 443-45; *United States v. Isaacs*, 493 F.2d 1124, 1146-49 (7th Cir. 1974) (holding that where check passed between two Illinois banks, but was cleared through St. Louis, Missouri, "the use of interstate facilities [] was so minimal [and] incidental" to the scheme that there was no jurisdiction under the Travel Act).  But the *Perrin* court, in devising its rule, specifically rejected *Isaac*'s focus on the nature and degree of interstate activity.  *See Perrin*, 580 F.2d at 735-36.  Therefore, to the extent *Blake* contradicts Fifth Circuit precedent, the court declines to follow *Blake*'s approach.

Applying Fifth Circuit precedent to this case, the court holds that depositing a check—where the check's data were wired to an Atlanta server and back to Texas—is a use of facility in interstate commerce.  Under the indictment, this use facilitated the alleged bribe payment from the FPMC officers to the Surgeon Defendants.  Therefore, the court holds that

the Travel Act counts sufficiently alleges a use of a facility in interstate commerce.

*  *  *

For the reasons explained, the court denies defendants' motions to dismiss.

**SO ORDERED**.

September 20, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE